IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Theresa M.,[1] | ) | C/A No.: 1:21-2660-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Kilolo Kijakazi, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court
for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B)
(D.S.C.), and the order of the Honorable Joseph Dawson, III, United States
District Judge, dated September 15, 2021, referring this matter for
disposition. [ECF No. 10]. The parties consented to the undersigned United
States Magistrate Judge's disposition of this case, with any appeal directly to
the Fourth Circuit Court of Appeals. [ECF No. 9].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social
Security Act ("the Act") to obtain judicial review of the final decision of the
Commissioner of Social Security ("Commissioner") denying the claim for
disability insurance benefits ("DIB"). The two issues before the court are

---

[1] The Committee on Court Administration and Case Management of the
Judicial Conference of the United States has recommended that, due to
significant privacy concerns in social security cases, federal courts should
refer to claimants only by their first names and last initials.

whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On September 21, 2018, Plaintiff protectively filed an application for DIB in which she alleged her disability began on July 25, 2018. Tr. at 101, 196–97. Her application was denied initially and upon reconsideration. Tr. at 127–30, 135–41. On September 11, 2020, Plaintiff had a hearing by telephone before Administrative Law Judge ("ALJ") James Cumbie. Tr. at 53–88 (Hr'g Tr.). The ALJ issued an unfavorable decision on December 11, 2020, finding Plaintiff was not disabled within the meaning of the Act. Tr. at 28–52. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 8–13. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on August 19, 2021. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 62 years old at the time of the hearing. Tr. at 64. She completed high school. Tr. at 215. Her past relevant work ("PRW") was as a cloth inspector. Tr. at 81. She alleges she has been unable to work since July 25, 2018. Tr. at 196.

2.    Medical History

On July 27, 2018, Plaintiff complained of at least two panic attacks per day. Tr. at 378. She endorsed poor sleep and described palpitations and tearfulness that occurred with small stressors. *Id.* Erin Cooksey, M.D. ("Dr. Cooksey"), recorded normal findings on exam, except for reduced rate of thought processes and depressed mood. Tr. at 380. She prescribed Lorazepam 0.5 mg and Fluoxetine 40 mg. *Id.*

Plaintiff reported feeling better and being less tearful and moody on August 13, 2018. Tr. at 382. She reported a reduction in panic attacks to one per day, but said she continued to be somewhat withdrawn and to catnap throughout the day due to difficulty sleeping at night. *Id.* Dr. Cooksey recorded normal findings on exam. Tr. at 384. She prescribed Lorazepam 1 mg twice a day. Tr. at 384–85.

On September 7, 2018, Dr. Cooksey completed an attending physician statement for Plaintiff's private disability insurer. Tr. at 374–75. She

3

indicated Plaintiff first presented with symptoms related to depression and panic attacks on July 12, 2018. Tr. at 374. She stated she most recently examined Plaintiff on August 13, 2018. *Id.* She noted she had recommended therapy and medication. *Id.* She stated Plaintiff could not work due to "profound depression" and "impairment in concentration" beginning July 28, 2018. Tr. at 375.

Plaintiff reported more good than bad days on September 12, 2018. Tr. at 386. She said her panic attacks had decreased from two to three per day to two to three per week. *Id.* She endorsed continued irritability, avoidance of others, and trouble remembering and focusing. *Id.* She noted she had not attended church in two months. *Id.* Dr. Cooksey recommended Plaintiff attend therapy. *Id.* She subsequently wrote a note stating: "Please excuse patient from work 9-28-18 to 10-26-18." Tr. at 376.

Plaintiff endorsed anhedonia and increased problems due to fibromyalgia on October 12, 2018. Tr. at 390. She indicated she wanted to remain at home and in her bed. *Id.* She said she had stopped driving because she felt as if she could not concentrate and react quickly enough. *Id.* She reported her disability insurer had dissuaded her from therapy, indicating it would not be useful. *Id.* Dr. Cooksey disagreed and encouraged Plaintiff to pursue therapy. *Id.* She prescribed Duloxetine 120 mg daily, Fluoxetine 40 mg daily, Gabapentin 300 mg three times a day, Hydrochlorothiazide 35 mg

daily, Janumet 100-1,000 mg ER daily, Lorazepam 1 mg twice daily, Tramadol 50 mg every four to six hours, and Zetia 10 mg daily. Tr. at 392–93. She provided a work excuse for the period from October 12 through November 17, 2018. Tr. at 394.

On October 24, 2018, Plaintiff attended a final postoperative visit related to cataract surgery. Tr. at 530. R. Reid Murphy, M.D. ("Dr. Murphy"), released Plaintiff with no restriction on activities and instructed her to follow up as needed. *Id.*

Dr. Cooksey provided another note requesting Plaintiff be excused from work from October 26, 2018, through November 26, 2018. Tr. at 401.

On November 12, 2018, Plaintiff complained of feeling overwhelmed and on edge. Tr. at 396. She reported difficulty controlling her blood sugar, noting her fasting blood sugar had been 210 mg/dL that morning. *Id.* She indicated her therapy sessions were helping. *Id.* Dr. Cooksey ordered lab studies and encouraged Plaintiff to continue with counseling. Tr. at 398–99. She provided a note stating: "Please excuse pt from work 11-27-18 to 12-31-18 for Depression and anxiety." Tr. at 400.

On November 14, 2018, Dale Hullander, Ph.D., provided the following statement:

> I have seen Theresa on four occasions addressing her anxiety and depression. She has been cooperative and followed through on work I have asked her to do. The focus of treatment is to reduce the symptoms she has reported and return her to work as soon as

possible. I will continue to work with Theresa until we have
achieved these goals.

Tr. at 395.

On December 18, 2018, Plaintiff reported recent elevated blood sugar in
the 200s and 300s and increased thirst. Tr. at 490. She admitted she had
stopped Jardiance due to a yeast infection, but indicated her blood sugar had
been elevated before she stopped it. *Id.* She described increased feelings of
being off balance and indicated she had sustained several falls since her last
visit. Tr. at 490. She indicated she felt weak and was afraid to hold her
grandchildren. *Id.* Dr. Cooksey recorded no abnormal exam findings. Tr. at
492–93. She discontinued Jardiance, ordered lab studies and magnetic
resonance imaging ("MRI") of the brain and prescribed Ozempic for diabetes
and Diflucan 100 mg for a yeast infection. Tr. at 493. She provided a note
requesting Plaintiff be excused from work from December 31, 2018, through
January 31, 2019, for depression and anxiety. Tr. at 407.

Plaintiff presented to psychiatrist Dana Wiley, M.D. ("Dr. Wiley"), for a
psychiatric evaluation on December 19, 2018. Tr. at 417. She complained of
depression, anxiety, poor sleep, tremors, palpitations, and crying spells up to
four times a week. *Id.* She reported good appetite and denied manic episodes
and suicidal and homicidal ideations and attempts. *Id.* Dr. Wiley noted
Plaintiff was alert and oriented times three, had appropriate grooming and
hygiene, demonstrated normal behavior, had coherent and goal-directed

6

speech, and showed no delusions or auditory or visual hallucinations. Tr. at 418. He indicated Plaintiff's mood was depressed with some racing thoughts, panic attacks, and insomnia. *Id.* His diagnostic impressions were major depression and rule out bipolar disorder, type II. *Id.* He ordered a thyroid profile to rule out thyroid dysfunction as the cause of Plaintiff's depression. *Id.* He prescribed Cymbalta 60 mg twice a day for depression, Ativan 1 mg three times a day for anxiety, Lexapro 10 mg for depression, and Restoril 15 mg for insomnia. *Id.*

On December 20, 2018, an MRI of Plaintiff's brain revealed several small foci of T2 hyperintensity in the cerebral white matter. Tr. at 499. The pattern was nonspecific and the foci were of uncertain significance. *Id.* Donald V. Heck, M.D., noted the lesions were often seen in patients with risk factors for vascular disease and might reflect small vessel ischemia of the white matter. *Id.*

Dr. Cooksey completed an interactive process questionnaire on December 21, 2018, at the request of Plaintiff's employer.[2] Tr. at 409–12. She wrote: "Pt has profound depression and anxiety that have been refractory to treatment thus far. She has trouble with concentration, focus, and mood lability. She cannot complete sequential tasks." Tr. at 409. She further opined

---

[2] The cover letter is addressed to Plaintiff, but the enclosed form was not edited to replace Plaintiff's name with that of another employee. *See* Tr. at 408–12.

that Plaintiff would be unable to return to work for an indefinite period. Tr. at 410. She noted Plaintiff's condition would cause episodic flare-ups that would prevent her from performing job functions and require she be absent from work. Tr. at 411. She stated Plaintiff's concentration and memory were profoundly impaired. *Id.* She noted Plaintiff experienced one episode every four weeks that lasted for two days at a time. *Id.*

On January 4, 2019, Plaintiff presented to neurologist Anthony Holt, D.O. ("Dr. Holt"), for evaluation of falls and the abnormal MRI findings. Tr. at 477. She described intermittent numbness in her feet and hands and balance problems when standing and walking. *Id.* Dr. Holt noted fair recall and concentration and otherwise normal findings on mental status exam ("MSE"). Tr. at 478. He recorded mostly normal findings on neurological exam, except for stocking sensory loss to all modalities, absent ankle jerk, and sensory ataxic gait. *Id.* He opined that Plaintiff likely had a polyneuropathy and noted her falls were likely related to significant stocking loss of sensation in both feet that caused ataxic gait. *Id.* He ordered electromyography ("EMG") of Plaintiff's bilateral lower extremities and lab studies and reviewed fall precautions. Tr. at 419.

On January 9, 2019, x-rays of Plaintiff's lumbar spine showed advanced lower lumbar facet degenerative joint disease ("DJD") and multilevel

degenerative disc disease ("DDD"), most pronounced at L5–S1. Tr. at 562. X-rays of Plaintiff's right knee reflected mild DJD. Tr. at 563.

Plaintiff discussed personal and family topics and endorsed partial improvement in her sleep on January 17, 2019. Tr. at 416. She denied acute psychosis and suicidal and homicidal ideations. *Id.* Dr. Wiley indicated Plaintiff's mood was more euthymic. *Id.* He noted fair insight and otherwise normal findings on MSE. *Id.* He prescribed Cymbalta 60 mg twice a day for depression, Ativan 1 mg three times a day for anxiety, Lexapro 10 mg for depression, and Restoril 30 mg at bedtime for insomnia. *Id.*

Plaintiff presented to Branham Tomarchio, M.D. ("Dr. Tomarchio"), for a consultative physical exam on January 19, 2019. Tr. at 567. Dr. Tomarchio noted he had taken a medical history from Plaintiff and had not had a chance to review any additional medical records related to her case. *Id.* Plaintiff described pain in the center of her upper back, her neck, and her bilateral shoulders. *Id.* She indicated the pain was associated with numbness and aggravated by sitting or lying down for too long. *Id.* She reported abilities to dress and feed herself, stand for 20 minutes at a time, lift two-and-a-half to five pounds, sweep, mop, vacuum, and shop. Tr. at 568. She denied cooking, washing dishes, ascending stairs, and mowing grass. *Id.* Dr. Tomarchio stated the following:

> I was able to observed Ms. M[] exit the passenger side . . . of her car in the parking lot. She exited the car with no problem. She

walked across the parking lot with a normal gait. She appeared comfortable in the seated position today. She appeared comfortable in the supine position today. She was able to rise straight up from the supine position today.

*Id.* He noted Plaintiff was obese at a height of 64 inches and weight of 209 pounds. *Id.* He recorded normal findings on physical exam, aside from knee pain with squatting. Tr. at 565–66, 568–69. His impression was chronic back pain. Tr. at 569. He noted Plaintiff complained of pain in her upper back, but he had no objective evidence of functional capacity deficit related to the problem. *Id.*

On January 28, 2019, Plaintiff reported her blood sugar had decreased from the 200s to between 120 and 150 mg/dL since starting Ozempic. Tr. at 485. She denied hypoglycemia. *Id.* She indicated Dr. Wiley had switched her from Prozac to Lexapro, but noted no change in symptoms. *Id.* Dr. Cooksey recorded normal findings on physical exam. Tr. at 487–88. She increased Ozempic. Tr. at 488.

On February 6, 2019, Plaintiff complained of balance problems upon ambulating. Tr. at 475. She denied falls. *Id.* Dr. Holt noted EMG testing was normal. *Id.* He indicated Plaintiff was alert and oriented, had normal language and attention, showed no apraxia, had no extinction or neglect, and demonstrated fair recall and concentration. *Id.* He recorded normal findings on general, cranial nerve, and motor exams, but noted stocking sensory loss to all modalities on sensory exam. *Id.* He found negative ankle jerk, but 2+

deep tendon reflexes ("DTRs") in the bilateral biceps, triceps, brachioradialis, and patellae. *Id.* He indicated Plaintiff had normal coordination, but sensory ataxic gait. Tr. at 476. Dr. Holt suspected Plaintiff had "the beginning of a polyneuropathy caused by diabetes," which, "in combination with microangiopathy noted on MRI of the brain, c[ould] cause balance problems." *Id.* He referred Plaintiff to physical therapy for balance exercises and gait training and prescribed Metanx. *Id.*

Plaintiff denied acute psychosis and suicidal and homicidal ideation on February 19, 2019. Tr. at 658. She reported more euthymic mood and good sleep and appetite. *Id.* Dr. Wiley recorded normal findings on MSE, except for fair insight. *Id.* He indicated fair prognosis. *Id.* He continued Plaintiff's medications and instructed her to follow up in 90 days. *Id.*

On February 21, 2019, state agency medical consultant Cynthia Heldrich, M.D. ("Dr. Heldrich"), reviewed the record and assessed Plaintiff's physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for total of about six hours in an eight-hour workday; frequently push/pull with the right lower extremity; frequently balance, stoop, crouch, and climb ladders/ropes/scaffolds; and occasionally kneel, crawl, and climb ramps/stairs. Tr. at 96–97. A second state agency medical consultant, Gary Turner, M.D.

("Dr. Turner"), affirmed Dr. Heldrich's RFC assessment on September 26, 2019. Tr. at 115.

Plaintiff presented to John C. Whitley, III, Ph.D. ("Dr. Whitley"), for a consultative psychological evaluation on February 28, 2019. Tr. at 615. She described symptoms of moderate anxiety. Tr. at 616. She indicated fears of heights, driving in general, and going over bridges and noted she did not like to be around crowds or people in general. *Id.* She endorsed physical problems of diabetes, neuropathy, and fibromyalgia, and indicated her coping ability had decreased as her pain had increased. Tr. at 616, 617. She said she had struggled with pain, loss of physical ability, and inability to be active. Tr. at 617. She reported falling easily. *Id.* She described agitation, crying, sadness, feelings of worthlessness and hopelessness, lack of energy, thoughts of dying, and loss of interest in activities. *Id.* She reported short-term memory problems that caused her to become lost when driving in familiar places, forget to take her medication, and be unable to recall phone numbers, her Social Security number, and her personal identification number. *Id.* Dr. Whitley noted Plaintiff's reported activity level appeared to be below average. *Id.* He described Plaintiff as ambulating with a slow gait and appearing to be in mild pain while walking. *Id.* He indicated Plaintiff's emotional state was mildly depressed and tearful with mild anxiety. *Id.* He noted Plaintiff recalled three of four items after a 15-minute delay and after a two-minute

delay with interference task. *Id.* He recorded mostly normal findings on MSE, aside from mildly-to-moderately-depressed mood, mildly anxious affect, tearfulness, and mildly-low energy level. *Id.* He assessed adjustment disorder with mixed anxiety and depressed mood and depressive disorder due to consistent pain with depressive features. Tr. at 617–18. Dr. Whitley opined that Plaintiff appeared capable of understanding and following two- and three-step work tasks. Tr. at 618. He felt Plaintiff would function more productively with simple and routine instructions, given her "current observed pain and mental health issues." *Id.* He noted Plaintiff might struggle with complex tasks and processing large amounts of information. *Id.* He stated Plaintiff's ability to meet production norms and maintain persistence in effort with simple tasks would be mildly impaired. *Id.* He further indicated Plaintiff's ability to cope with typical levels of stress, demands, and pressures at this time would be mildly- to moderately-impaired. *Id.* He considered Plaintiff capable of managing her appointments and financial matters. *Id.*

On March 24, 2019, state agency psychological consultant Silvie Ward, Ph.D., reviewed the record, completed a psychiatric review technique ("PRT"), considered Listings 12.04 for depressive, bipolar, and related disorders and 12.06 for anxiety and obsessive-compulsive disorders, and she assessed a non-severe mental impairment. Tr. at 93–94.

On April 22, 2019, Plaintiff denied improved balance and changes to her feet and legs since starting Metanx. Tr. at 526. Dr. Holt recorded normal findings on general and neurological exams, aside from fair recall and concentration, stocking sensory loss to all modalities, absent ankle jerk, and sensory ataxic gait. Tr. at 526–27. He discontinued Metanx and again referred Plaintiff to physical therapy. Tr. at 527. He noted Plaintiff had cerebrovascular disease and needed to start aspirin 81 mg daily. *Id.*

On April 26, 2019, Dr. Cooksey noted Plaintiff had been unsuccessful with diet, was not exercising regularly, and her diabetes was not well-controlled. Tr. at 517. Plaintiff stated Dr. Wiley had informed her she could return to work without restrictions. *Id.* She indicated her mood had improved. *Id.* She reported increased fibromyalgia-related symptoms in her hips, legs, and feet that prevented her from standing long enough to do dishes and said she did not feel like she could stand all day to work. *Id.* She stated Dr. Holt informed her that the white spots on her brain were contributing to her memory decline. *Id.* Dr. Cooksey recorded normal findings on exam. Tr. at 519–20. She ordered a mammogram and lab studies and instructed Plaintiff on diet and exercise. Tr. at 520.

Plaintiff presented to Select Physical Therapy for an initial evaluation on May 6, 2019. Tr. at 685. She reported a two-year history of falls and memory problems that had worsened over the prior year. *Id.* She stated she

was unable to drive, had difficulty climbing stairs and walking in her yard, and could not cook, clean, or transfer laundry from the washer to the dryer. *Id.* Plaintiff completed a lower extremity functional scale questionnaire, providing responses consistent with 60–80% impairment. *Id.* She requested assistance to eliminate falls and improve lower extremity strength and balance. *Id.* Physical therapist Jay Burdette ("PT Burdette") observed Plaintiff to demonstrate mild ataxia without an assistive device and 4-/5 lower extremity strength in the bilateral hips and knees. *Id.* He assessed a score of 32/56 on the Berg Balance test, consistent with medium fall risk. *Id.* He noted a 15-minute in-depth discussion to convince Plaintiff to use a rolling walker. Tr. at 686. He indicated Plaintiff had weakened leg muscles from inactivity and balance deficit. *Id.* He specified goals for Plaintiff to have no falls over the next four weeks, to be able to transfer clothes from the washer to the dryer, to improve her functional level to 40–60%, to ambulate independently with a rolling walker, and to have 4+/5 lower extremity strength. *Id.*

Plaintiff returned for physical therapy sessions on May 8, 16, 22, 24, 30, and 31 and June 5, 12, 19, 21, and 27, 2019. Tr. at 689–13. PT Burdette noted Plaintiff tolerated exercises well during sessions. *Id.* He encouraged Plaintiff to obtain a rolling walker. Tr. at 696.

Dr. Cooksey provided a response to Plaintiff's disability insurer's May 29, 2019 inquiry. Tr. at 715–16. She indicated the loss of sensation in Plaintiff's feet was not caused by diabetic polyneuropathy. Tr. at 715. She stated Plaintiff's symptoms were multifactorial with diabetes and fibromyalgia both contributing. *Id.* She reviewed a description of Plaintiff's PRW and checked a box to indicate she would be unable to meet its demands. *Id.* She explained Plaintiff's depression was interfering with her thought process, concentration, and reaction time. Tr. at 716. She stated Plaintiff's prognosis was poor. *Id.* She noted Plaintiff's last office visit was on April 26 and her next visit was scheduled for August 19. *Id.*

Plaintiff complained of bad days due to depression and poor sleep on June 6, 2019. Tr. at 657. She indicated she had been unable to obtain Restoril. *Id.* She endorsed euthymic mood and no acute psychosis or suicidal or homicidal ideation. *Id.* Dr. Wiley recorded normal findings on MSE. *Id.* He indicated fair insight and prognosis. *Id.* He added Trazodone 50 mg for insomnia and increased Lexapro to 20 mg for depression. *Id.*

Plaintiff presented to PT Burdette for physical therapy re-evaluation and discharge on June 27, 2019. Tr. at 712. She continued to report 60–80% impaired lower extremity functioning. *Id.* Her lower extremity strength in her hips and knees had improved to 5-/5 and her score on the Berg Balance test was 43/56, indicated as low fall risk. *Id.* PT Burdette noted Plaintiff had

made excellent improvement in balance and strength. Tr. at 713. He indicated Plaintiff continued to have balance deficits, but was in the low fall risk category. *Id.* He acknowledged Plaintiff had met her goal of being able to transfer clothes from the washer to the dryer and was able to drive occasionally, but continued to have difficulty with stairs, walking in the yard, cooking, and cleaning. *Id.*

On July 8, 2019, Plaintiff reported increasing neck, shoulder, hip, and back pain over the prior week. Tr. at 632. She indicated she might have overdone it while exercising in a pool. *Id.* She described increased pain in her buttocks with sitting and general pain with prolonged walking. *Id.* She reported using a rollator more frequently to help with balance. *Id.* Dr. Cooksey noted multiple areas of trigger-point tenderness over Plaintiff's back, neck, and buttocks, but otherwise normal findings on exam. Tr. at 634–35. She assessed fibromyalgia and back, neck, hip, and shoulder pain and ordered lab studies. Tr. at 635.

On July 22, 2019, Plaintiff reported improvement with physical therapy. Tr. at 733. She denied recent falls and indicated she was using a rollator most of the time. *Id.* Dr. Holt recorded normal findings on general and neurological exams, aside from fair recall and concentration, stocking sensory loss to all modalities, absent bilateral ankle jerk, and abnormal sensory ataxic gait. Tr. at 733–34. He recommended Plaintiff continue her

home physical therapy exercises and use of a rollator. Tr. at 734. He explained the benefits and side effects of Plavix and prescribed 75 mg daily. *Id.*

Plaintiff also followed up with Dr. Wiley on July 8, 2019. Tr. at 656. She endorsed euthymic mood, labile sleep, and no acute psychosis or suicidal or homicidal ideation. *Id.* Dr. Wiley changed medication for insomnia to Trazodone 150 mg. *Id.*

On August 8, 2019, Plaintiff had euthymic mood, no acute psychosis, and no suicidal or homicidal ideation. Tr. at 655. She reported seeing her neurologist for falls and memory problems. *Id.* Dr. Wiley recorded normal MSE findings. *Id.* He noted fair insight and prognosis. *Id.*

On August 26, 2019, Plaintiff reported she was unsuccessful with diet and was not exercising regularly. Tr. at 717. She indicated she was seeing a neurologist for headaches and Dr. Wiley for mood, which remained the same. *Id.* Dr. Cooksey noted uncontrolled diabetes with hemoglobin A1C of 6.1%, elevated liver enzymes, fair control of hyperlipidemia, and stable fibromyalgia. Tr. at 719.

On September 5, 2019, Plaintiff reported possible stress-related lesions on her neck, arms, and legs, but endorsed good sleep, euthymic mood, no active psychosis, and no suicidal or homicidal ideation. *Id.* Dr. Wiley indicated fair insight and prognosis, but otherwise normal findings on MSE.

*Id.* He noted Plaintiff was able to work. *Id.* He assessed major depressive disorder ("MDD") and generalized anxiety disorder ("GAD"). *Id.*

Plaintiff complained of a two-week history of hives on September 12, 2019. Tr. at 722. Dr. Cooksey assessed idiopathic urticaria, administered a Kenalog injection, and prescribed Zyrtec and Ranitidine. Tr. at 724–25.

On September 25, 2019, Plaintiff reported using a rollator and denied recent falls. Tr. at 731. Dr. Holt assessed normal exam findings, aside from fair recall and concentration, stocking sensory loss to all modalities, absent bilateral ankle jerk, and abnormal sensory ataxic gait. Tr. at 731–32. He instructed Plaintiff to continue Plavix, use of a rollator, and fall precautions. Tr. at 732.

Plaintiff followed up with Dr. Wiley for medication management on October 17, 2019. Tr. at 653. She discussed personal health issues, and Dr. Wiley noted she was using a walker due to dizziness and tripping. *Id.* Plaintiff endorsed increased anxiety, but good sleep, euthymic mood, and no acute psychosis of suicidal or homicidal ideation. *Id.* Dr. Wiley noted fair insight and prognosis and otherwise normal findings on MSE. *Id.* His diagnoses included MDD and GAD. *Id.* He increased Plaintiff's anxiety medication, prescribing Ativan 2 mg twice a day. *Id.*

On November 13, 2019, Dr. Holt informed Plaintiff's disability insurer that he had not specifically instructed her to remain out of work. Tr. at 735.

On November 21, 2019, state agency psychological consultant Ruth Ann Lyman, Ph.D. ("Dr. Lyman"), reviewed the record, completed a PRT, and considered Listings 12.04 and 12.06. Tr. at 115–17. She assessed mild limitations in Plaintiff's abilities to understand, remember, or apply information and moderate limitations in her abilities to interact with others, concentrate, persist, or maintain pace, and adapt or manage oneself. Tr. at 116. She wrote: "While [claimant's] mental impairments are severe, they are not so severe as to preclude all forms of work. [Claimant] appears capable of performing at least simple tasks, and likely some low level detailed tasks, in a low stress setting that does not require ongoing contact with the public." Tr. at 117.

Plaintiff reported good sleep, labile appetite, improved anxiety, worsening memory, euthymic mood, and no acute psychosis or suicidal or homicidal ideation on December 23, 2019. Tr. at 738. Dr. Wiley noted mostly normal findings on MSE, but fair insight and impaired memory with one-out-of-four word recall and ability to recall digits. *Id.* He noted Plaintiff was disabled. *Id.*

Plaintiff reported using a rollator for balance and requested a handicap placard on December 26, 2019. Tr. at 743. Dr. Cooksey noted Plaintiff's diabetes remained uncontrolled with hemoglobin A1C of 6.3%. Tr. at 746. She prescribed Vitamin E and Plavix. Tr. at 743–44.

On January 9, 2020, Plaintiff complained of hematuria, urinary frequency, and a four-day history of dysuria. Tr. at 750. She also described suprapubic pressure and intermittent back pain. *Id.* Dr. Cooksey ordered a computed tomography ("CT") scan to rule out kidney stones. Tr. at 752. The CT scan showed moderately-obstructing right mid-ureteral calculi and a minimally-obstructive distal left ureteral calculus, as well as bilateral nephrolithiasis. Tr. at 748–49.

Plaintiff presented to nurse practitioner Jennifer Burger ("NP Burger") in Dr. Wiley's office on February 24, 2020. Tr. at 739. She described a few crying incidents and meltdowns, good sleep, labile appetite, euthymic mood, and no acute psychosis or suicidal or homicidal ideation. *Id.* She endorsed depression, headaches, and knee pain. *Id.* NP Burger recorded mostly-normal findings on MSE, but fair insight and prognosis. *Id.* She prescribed Wellbutrin XL 150 mg and discontinued Cymbalta. *Id.*

Plaintiff complained of recent headaches on March 25, 2020. Tr. at 770. She described throbbing pain that started in the frontal aspect of her head, shifted to the side, and was accompanied by photophobia and nausea. *Id.* Dr. Holt noted mostly-normal findings on general and neurological exams, except for fair recall and concentration, stocking sensory loss to all modalities, absent ankle jerk, and abnormal sensory ataxic gait. Tr. at 770–71. He stated Plaintiff needed to remain on Plavix and "to continue using her Rollator

walker for prevention of falls." Tr. at 771. He ordered an MRI of the brain and lab studies and prescribed Depakote ER. *Id.*

Plaintiff participated in a telemedicine visit on April 6, 2020. Tr. at 754. She denied exercising and endorsed worry due to COVID-19. *Id.* Dr. Cooksey emphasized the benefits of walking or stretching to help with fibromyalgia and mood. *Id.* She refilled Plaintiff's medications. Tr. at 755.

On April 16, 2020, an MRI of Plaintiff's brain showed advanced, diffuse micro-ischemic changes in the bilateral cerebral hemispheres and within the pons of the brainstem. Tr. at 774. Bret J. Warner, M.D., noted the findings appeared chronic. *Id.*

Plaintiff followed up in Dr. Wiley's office on April 23, 2020. Tr. at 785. She reported sleeping a lot, good appetite, and labile motivation, energy, and mood. Tr. at 785. The provider noted mostly normal findings on MSE, aside from fair concentration and labile mood. *Id.* He assessed MDD and indicated a fair prognosis and inability to work. *Id.* He decreased Lexapro to 10 mg. *Id.*

Plaintiff followed up with Dr. Holt on May 8, 2020. Tr. at 775. She reported Depakote ER had "helped somewhat" with her headaches. *Id.* Dr. Holt noted the MRI of Plaintiff's brain revealed severe microangiopathy. *Id.* He recorded mostly normal findings on general and neurological exams, except for fair recall and concentration, stocking sensory loss to all modalities, absent ankle jerk, and abnormal sensory ataxic gait. Tr. at 775–

76. He recommended Plaintiff remain on Plavix and "continue using her Rollator walker for prevention of falls." Tr. at 776. He increased Depakote ER to 500 mg twice a day to address headaches. *Id.*

Dr. Cooksey completed a treating physician medical opinion form on May 20, 2020. Tr. at 759–60. She indicated a diagnosis of fibromyalgia. Tr. at 759. She estimated Plaintiff could sit for greater than six hours, stand for less than two hours, and walk for less than two hours in an eight-hour workday. *Id.* She indicated Plaintiff could sit for greater than an hour, stand for less than an hour, and walk for less than 30 minutes without interruption. *Id.* She noted she had advised Plaintiff to use an assistive device. *Id.* She estimated Plaintiff could lift and carry a maximum of 10 pounds and could frequently lift and carry five pounds. *Id.* She stated Plaintiff had no useful ability to crawl; could occasionally climb, balance, squat, kneel, crouch, push and pull bilaterally, and perform simple grasping on the left; and could frequently perform simple grasping on the right, reach overhead, and perform fine and gross manipulation with the bilateral hands. Tr. at 759–60. She noted activity increased Plaintiff's pain and fatigue. Tr. at 760. She confirmed Plaintiff had reported pain and fatigue to her and considered those symptoms reasonable, given her impairments. *Id.* She estimated Plaintiff would require four to six unscheduled 10-minute breaks over the course of an eight-hour workday due to energy deficits. *Id.* She anticipated Plaintiff would

23

be absent from work more than four days per month due to her impairments, symptoms, and treatment. *Id.* She indicated Plaintiff's medication regimen caused side effects that could reasonably interfere with her ability to function in the workplace. *Id.*

Plaintiff participated in a telemedicine visit with NP Burger on May 26, 2020. Tr. at 786. She endorsed good sleep and appetite and euthymic mood. *Id.* NP Burger recorded normal findings on MSE, aside from fair insight and judgment. Tr. at 786–87.

On June 10, 2020, Plaintiff reported continued headaches, despite taking Depakote ER twice a day. Tr. at 778. Dr. Holt's findings on general and neurological exams were consistent with his prior observations. Tr. at 778–79. He instructed Plaintiff to continue use of Plavix and "her Rollator walker for prevention of falls." Tr. at 779. He discontinued Depakote ER and started a trial of Ajovy for headaches. *Id.*

Plaintiff reported Ajovy was controlling most of her migraines on July 8, 2020. Tr. at 780. Dr. Holt recorded findings consistent with prior exams. Tr. at 780–81. He instructed Plaintiff to continue Plavix, Ajovy, and "using her Rollator walker for prevention of falls." Tr. at 781.

On July 21, 2020, Plaintiff reported memory loss, tremor, and dizziness and noted her neurologist had diagnosed white matter disease. Tr. at 790. She complained of hives due to increased anxiety. *Id.* She endorsed a 20-

pound weight loss. *Id.* NP Burger recorded normal findings on MSE, except for fair insight and judgment. Tr. at 790–91.

On August 18, 2020, Plaintiff complained of shoulder, neck, and back pain. Tr. at 762. She said she fell three weeks prior, landing on her left shoulder. *Id.* She noted residual pain in her neck, shoulder, and upper arm. *Id.* She indicated she was unable to exercise due to balance issues, for which she was seeing a neurologist and using a rollator. *Id.* She reported her neurologist had prescribed Ajovy for migraines, but she was having trouble using the pen. *Id.* Dr. Cooksey's nurse spent 30 minutes attempting to assist Plaintiff with the Ajovy pen and ultimately concluded she had received a defective product. *Id.* Dr. Cooksey observed tenderness over Plaintiff's left shoulder, trapezius, and deltoid with decreased range of motion, as well as tenderness to palpation of the collarbone. Tr. at 765. She ordered lab studies. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on September 11, 2020, Plaintiff testified she lived with her husband, sister, and 30-year-old son. Tr. at 66. She said she read, watched television, and stayed inside her house during a typical day. Tr. at 66–67. She stated her husband and sister cooked and performed household

chores. Tr. at 67. She indicated her sister had moved in nearly a year prior to assist her. *Id.* She stated her husband and sister worked opposite shifts so one of them would be with her at all times. Tr. at 67–68. She testified she had assisted her husband with food preparation and grocery shopping before she stopped working. Tr. at 68. She said she stopped driving because her shakiness prevented her from driving straight. *Id.*

Plaintiff described a bad day as one in which she could not function. Tr. at 69. She said she felt dizzy and spent the day sitting or lying down in her bed, on the couch, or in a recliner. *Id.* She noted she experienced "bad migraines." *Id.* She said she had bad days once or twice a week. *Id.* She indicated she could not do a lot on any day. *Id.* She stated she used a walker and required help doing everything. *Id.* She said she experienced shaking and memory loss all the time. *Id.* She described herself as "very weak and shaky." *Id.*

Plaintiff testified she spoke with friends over the phone, but did not go out with them. Tr. at 70. She said she had attended church services in person while she was working, but currently attended online services. *Id.* She indicated she could no longer engage in scrapbooking due to shaking in her hands or walk for exercise due to her impairments. Tr. at 70–71. She confirmed she used a rollator to walk. Tr. at 71. She said she showered using a seat, bars, and a handheld shower and could no longer get in the tub. *Id.*

She stated she required assistance to button and zip clothing, pull clothing overhead, and pull clothing up her legs. *Id.* She said her memory loss had caused her to stop driving because she often forgot her destination. *Id.* She admitted she still had a driver's license. Tr. at 78. She noted her migraines were debilitating. Tr. at 71–72.

Plaintiff denied working since July 25, 2018. Tr. at 72. She stated she received private disability benefits from Unum. Tr. at 73. She noted she had been dealing with depressive symptoms, was very emotional, and cried a lot. Tr. at 75. She indicated Dr. Cooksey had referred her to Dr. Wiley for additional treatment for these symptoms. Tr. at 76.

Plaintiff expressed her disagreement with Dr. Wiley's assessment of her concentration as "good." *Id.* She indicated she disagreed with Dr. Cooksey's impression that she could engage in frequent fine bilateral manipulation and handling, frequent grasping on the right, and occasional grasping on the left because she had a severe problem with shaking and weakness in her hands. Tr. at 77. She stated she had seen Dr. Holt more frequently than Dr. Cooksey for problems using her hands. *Id.* She testified she had seen Dr. Burger in Dr. Wiley's office, but had not returned for treatment in two to three months. Tr. at 79–80.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Lisa D. Cary reviewed the record and testified at the hearing. Tr. at 80–85. The VE categorized Plaintiff's PRW as a cloth inspector, *Dictionary of Occupational Titles* ("*DOT*") No. 685.687-010, as requiring light exertion and a specific vocational preparation ("SVP") of 4. Tr. at 81. The ALJ asked the VE if Plaintiff's PRW produced any transferable skills. *Id.* The VE stated skills from Plaintiff's PRW would not transfer to the light or sedentary exertional level. *Id.* The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform work at the medium exertional level; would be limited to frequent kneeling; and could perform jobs at *DOT* mental reasoning level 2, defined as applying commonsense understanding to carry out detailed, but uninvolved written or oral instructions and dealing with problems involving a few concrete variables in or from standardized situations. *Id.* The VE testified that the hypothetical individual would be able to perform Plaintiff's PRW. Tr. at 82. The ALJ asked whether there were any other jobs in the national economy that the hypothetical person could perform. *Id.* The VE identified medium jobs with an SVP of 2 as a laundry worker I, *DOT* No. 361.684-014, a kitchen helper, *DOT* No. 318.687-010, and a dining room attendant, *DOT* No. 311.677-018, with 33,000, 165,000, and 110,000 positions in the national economy, respectively. *Id.*

The ALJ next described a hypothetical individual of Plaintiff's vocational profile who could perform the full range of light work; could frequently kneel; and would be limited to jobs at *DOT* mental reasoning level 2, defined as applying commonsense understanding to carry out detailed, but uninvolved written or oral instructions and dealing with problems involving a few concrete variables in or from standardized situations. Tr. at 82–83. He asked if the individual would be able to perform Plaintiff's PRW. Tr. at 83. The VE testified the individual would be able to perform Plaintiff's PRW as actually and generally performed. *Id.*

For a third hypothetical question, the ALJ described an individual of Plaintiff's vocational profile who was limited to sedentary work, but would be unable to stand for two hours cumulatively; was unable to maintain concentration, persistence, and pace for two-hour increments; could only occasionally reach, handle, finger, and feel; and must be permitted to use a walker with both hands at all times for balance and ambulation. *Id.* He asked if the individual would be able to complete Plaintiff's PRW. Tr. at 83–84. The VE indicated the individual would not. Tr. at 84. The ALJ asked if there would be any jobs available in the national economy. *Id.* The VE responded "[n]o." *Id.*

Plaintiff's counsel asked the VE to consider the second hypothetical question involving the light exertional level and to assume the individual

must use both hands to operate a walker at all times she is on her feet. *Id.*

She asked if the additional restriction would change the available jobs. *Id.*

The VE stated it would be work-preclusive. *Id.*

Plaintiff's counsel asked the VE to consider the first hypothetical question involving the medium exertional level and to assume the individual would be required to use both hands to operate a walker for all standing and ambulation. Tr. at 84–85. She asked if the additional restriction would change the VE's response to the first question. Tr. at 85. The VE testified it would be work-preclusive. *Id.*

### 2.    The ALJ's Findings

In his decision dated December 11, 2020, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.
2.    The claimant has not engaged in substantial gainful activity since July 25, 2018, the alleged onset date (20 CFR 404.1571 *et seq.*).
3.    The claimant has the following severe impairments: multilevel lumbar degenerative disc disease (DDD), obesity, adjustment disorder, depression, and generalized anxiety disorder. (20 CFR 404.1520(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). The claimant is limited to frequent kneeling. She is limited to work with Dictionary of Occupational Titles Mental Reasoning Level 2,

applying commonsense understanding to carry out detailed but uninvolved written or oral instructions. She can deal with problems involving a few concrete variables in or from standardized situations.

6.   The claimant is capable of performing past relevant work as a cloth inspector (DOT # 685.687-010). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.   The claimant has not been under a disability, as defined in the Social Security Act, from July 25, 2018, through the date of this decision (20 CFR 404.1520(f)).

Tr. at 33–47.

## II.   Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)   the ALJ failed to properly consider Plaintiff's need for a rollator walker in assessing her RFC;

2)   the ALJ did not properly consider Plaintiff's subjective allegations in assessing an RFC for light work; and

3)   the ALJ erred in failing to assess Plaintiff's migraines as a severe impairment and to account for them in assessing her RFC.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

### A.   Legal Framework

#### 1.   The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

31

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5)

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant

whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to

---

work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390,

401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Use of Rollator

Plaintiff argues the ALJ failed to properly consider evidence that supported her need for a rollator walker for ambulation in assessing her RFC. [ECF No. 16 at 6]. She maintains the ALJ improperly dismissed Dr. Holt's opinion that she required a rollator to prevent falls as unpersuasive. *Id.* She contends the ALJ's rejection of Dr. Holt's directive for a rollator as based on her subjective complaints is unfounded, as it was based on MRI results and his objective findings. *Id.* at 6–7. She asserts the ALJ failed to consider her receipt of long-term disability benefits. *Id.* at 6. She claims the ALJ's reliance on Dr. Tomarchio's opinion over Dr. Holt's is problematic because Dr. Holt prescribed the rollator after her visit with Dr. Tomarchio and Dr. Tomarchio did not review her records in forming his opinion. *Id.* at 7–8. She maintains

Dr. Tomarchio's observations as to her gait differed from those of the other medical sources, including Dr. Whitley, the other consultative examiner. *Id.* at 8–9. She points out the VE testified her use of a rollator would preclude all work. *Id.* at 9.

The Commissioner argues substantial evidence supports the ALJ's evaluation of the medical opinions and his conclusion that Plaintiff did not require a walker. [ECF No. 18 at 8]. She maintains the ALJ found Dr. Tomarchio's opinion partially persuasive, as he credited Dr. Tomarchio's observations and exam findings, but assessed a more restrictive RFC. *Id.* at 9. She contends Dr. Holt did not provide a medical opinion as defined in the regulations, but merely recommended Plaintiff use a walker for prevention of falls. *Id.* at 9–10. She asserts the ALJ complied with the requirements of SSR 96-9p in evaluating evidence as to whether a walker was medically-required and notes Dr. Holt failed to specify the circumstances under which Plaintiff required use of a walker. *Id.* at 10–11. She claims the ALJ adequately explained his reasons for declining to include required use of a walker in the RFC assessment. *Id.* at 11.

A claimant's RFC represents the most she can still do, despite limitations imposed by her impairments and symptoms. 20 C.F.R. § 404.1545(a). The RFC assessment must be based on all the relevant evidence in the case record. SSR 96-8p, 1996 WL 374184, at *2.

"A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling." *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) (citing *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984). "The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence. *Id.* (citing *Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989)). The narrative discussion should reference specific medical facts, such as medical signs and laboratory evidence, and non-medical evidence, including daily activities and observations. SSR 96-8p, 1996 WL 374184, at *7.

Medical source opinions are among the evidence that must be considered in assessing a claimant's RFC. *Id.* "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

The ALJ must consider the persuasiveness of all the medical opinions in the record in light of supportability, consistency, the relationship between the claimant and the medical source, the medical source's specialization, and any other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1520c(b), (c). However, in most cases, he is only required to articulate how he considered supportability and consistency, as they are considered the most important factors in assessing the persuasiveness of an opinion. 20

C.F.R. § 404.1520c(a), (b)(2). In evaluating supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinion . . . will be." 20 C.F.R. § 404.1520c(c)(1). As for the consistency factor, "[t]he more consistent a medical opinion . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion . . . will be." 20 C.F.R. § 404.1520c(c)(2). The ALJ's conclusion as to the persuasiveness of a medical opinion must be supported by substantial evidence.

The ALJ "must explain how any material inconsistencies or ambiguities in the case record were considered and resolved." SSR 96-8p, 1996 WL 374184, at *7. "An ALJ has the obligation to consider all relevant evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017) (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). "[R]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015).

The ALJ wrote the following:

On March 25, 2020, May 8, 2020, June 10, 2020, July 8, 2020, Dr. Holt opined the claimant needed to continue using her walker for the prevention of falls (Exhibit 26F, pp. 4, 9, 12, 14). This is not persuasive as it is heavily reliant on the claimant's self-reporting rather than based on objective findings including the referring physician's Dr. Cooksey's own objective testing discussed above.

Although a MRI showed white matter disease, the claimant's objective findings in the neurological records appear to be carried over from one appointment to the next as they are unchanged from the very first appointment, as they note an ataxic gait and never note actual use of a walker. They are inconsistent with the findings of the consultative examination, which occurred in the interim and showed normal range of motion in the neck, back and upper and lower extremities, negative straight leg raising, intact sensation throughout, symmetrical reflexes, full strength, and a normal gait and gait maneuvers. These findings are also more persuasive as they were performed by a disinterested party. This is inconsistent with the claimant's improvement with PT, in both balance and strength. The claimant's primary care notes in August did not note the claimant to be ambulating with a walker (Exhibit 25F).

Tr. at 45.

Earlier in the decision, the ALJ wrote: "As to the claimant's gait, it was noted to be ataxic in her neurology notes and she reported using a rolling walker but she was observed to have a normal gait during her consultative examination and she was not observed to have atrophy of muscles that one would expect with an ataxic gait (Exhibits 8F, 9F, 23F, 26F)." Tr. at 42.

Pertinent to the parties' arguments, a medical opinion is "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or

restrictions" in "[y]our ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions." 20 C.F.R. § 404.1513(a)(2). Contrary to the Commissioner's argument, Dr. Holt's recommendation that Plaintiff use a rollator to help with balance was a medical opinion because it imposed a restriction on Plaintiff's ability to perform the physical demands of work.

Review of the record shows Plaintiff initially presented to Dr. Holt on February 6, 2019, with complaints of balance problems with ambulation. Tr. at 475. Dr. Holt recorded mostly normal findings, but found stocking sensory loss to all modalities on sensory exam, negative ankle jerk, and sensory ataxic gait. Tr. at 475–76. On February 28, 2019, Dr. Whitley noted Plaintiff ambulated with slow gait and appeared to be in mild pain while walking. Tr. at 617. Notes from the May 6, 2019 physical therapy consultation indicated PT Burdette engaged in a 15-minute in-depth conversation to convince Plaintiff to use a rolling walker and included a treatment goal for her to ambulate independently with a walker. Tr. at 686. PT Burdette again discussed a rolling walker on May 24, 2019. Tr. at 696. On July 8, 2019, Plaintiff informed Dr. Cooksey that she was using a rollator more frequently to help with balance.[5] Tr. at 632. On July 22, 2019, she told Dr. Holt she was

---

[5] Dr. Cooksey documented normal findings on neurological exam during this visit, but did not perform neurological exams during subsequent visits. *See* Tr. at 635–35, 719–20, 724, 745–46, 752, 754–55, 764–65.

using the rollator most of the time and Dr. Holt recommended she continue to do so. Tr. at 733. Plaintiff again reported using the rollator on September 25, 2019, and Dr. Holt again encouraged her to continue to use it and follow fall precautions. Tr. at 731–72. On October 17, 2019, Dr. Wiley noted Plaintiff was using a walker due to dizziness and tripping. Tr. at 653. On December 26, 2019, Dr. Cooksey stated Plaintiff was "now using a rollator to help with her balance." Tr. at 743. Dr. Holt repeatedly emphasized Plaintiff should continue using a rollator for prevention of falls during follow up visits on March 25, May 8, June 10, and July 8, 2020. Tr. at 771, 776, 779, 781. On May 20, 2020, Dr. Cooksey indicated on a form that she had advised Plaintiff to use an assistive device. Tr. at 759. On August 18, 2020, Plaintiff reported a fall three weeks prior, and Dr. Cooksey noted Plaintiff had "been seeing neurology and using a strollator" for balance issues. Tr. at 762.

The ALJ cited credible evidence to support a conclusion that Plaintiff did not require a walker at the time of Dr. Tomarchio's consultative exam, but he appears to have cherrypicked evidence after January 2019 to support his conclusion. Contrary to the ALJ's assertion, Plaintiff did not present to Dr. Holt until after Dr. Tomarchio's consultative exam. The ALJ cited some of the evidence above and provided reasons for discounting it. However, his decision fails to address observations from Drs. Whitley and Wiley, recommendations from PT Burdette and Dr. Cooksey that Plaintiff use an

assistive device, and Plaintiff's 2020 fall. *See generally* Tr. at 38–46. The ALJ did not address evidence of Plaintiff's impaired balance through any provision in the RFC assessment, and he did not consider all the evidence in declining to include such a provision.

Substantial evidence does not support the ALJ's evaluation of the persuasiveness of Dr. Holt's opinion. The record refutes the ALJ's assertion that Dr. Holt based the recommendation that Plaintiff use a walker on her self-reports. Review of Dr. Holt's July 22, 2019 treatment note reveals the following: "I recommend that she continue her home exercise program given to her by physical therapy. I also recommend that she continues all of the recommendations including a Rollator walker." Tr. at 734. Thus, Dr. Holt did not recommend use of rollator because Plaintiff informed him she was using one, but rather because he adopted the physical therapy discharge recommendation. In evaluating the consistency of Dr. Holt's opinion, the ALJ did not consider that PT Burdette and Dr. Cooksey also suggested Plaintiff needed an ambulatory assistive device. *See* Tr. at 686, 696, 759.

In evaluating the supportability factor, the ALJ did not thoroughly consider Dr. Holt's explanation as to how the objective evidence supported his opinion. In February 2019, Dr. Holt opined that Plaintiff's balance difficulties were related to polyneuropathy caused by diabetes, as well as

microangiopathy[6] noted on MRI of the brain. Tr. at 476. The 2018 MRI revealed several small foci of T2 hyperintensity in the cerebral white matter that were of uncertain significance. Tr. at 499. However, by 2020, the diffuse micro-ischemic changes in the bilateral cerebral hemispheres and within the pons of the brainstem were considered advanced. Tr. at 774. After reviewing the MRI results, Dr. Holt diagnosed severe microangiopathy on May 8, 2020. Tr. at 775. While the ALJ recited the findings from the 2018 and 2020 MRIs of Plaintiff's brain, he did not acknowledge that progression of microangiography could reasonably account for a decline in her balance between 2018 and 2020. *See* Tr. at 41.

Although the Commissioner argues the record contained insufficient documentation to establish the rollator was medically-required, as defined in SSR 96-9p, the ALJ did not cite SSR 96-9p to support his decision to exclude use of a rollator from the RFC assessment. The court is constrained to consider only the reasons the ALJ provided to support his conclusion. *See Robinson ex rel. M.R. v. Commissioner of Social Sec.*, C/A No. 0:07-3521-GRA,

---

[6] Cerebral microangiopathy "manifests itself in manifold clinical symptoms including gait disorders, urinary disturbances, depression, and cognitive decline." S. Okroglic et al., *Clinical Symptoms and Risk Factors in Cerebral Microangiography Patients*, Public Library of Science ONE, Feb. 5, 2013, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3564848/. A court may take judicial notice of factual information located in postings on government websites. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (finding that court may "properly take judicial notice of matters of public record").

2009 WL 708267, at *12 (D.S.C. Mar. 12, 2009) ("[T]he principles of agency law limit this Court's ability to affirm based on post hoc rationalizations by the Commissioner's lawyers. '[R]egardless [of] whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for [her] decision and confine our review to the reasons supplied by the ALJ.'") (quoting *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002)).

The ALJ's RFC assessment is not supported by substantial evidence, given his failures to address evidence contrary to his conclusion and to evaluate the persuasiveness of Dr. Holt's opinion in light of all relevant evidence.

### 2.    Subjective Symptom Evaluation

Plaintiff argues the ALJ erroneously found her ADLs supported an exertional capacity for light work. [ECF No. 16 at 9–10]. She maintains her ADLs were inconsistent with an ability to perform light exertion, she was unable to perform many tasks, and she often required assistance. *Id.* at 10–11. She asserts there is no evidence in the record to contradict her statements as to her ADLs. *Id.* at 11. She claims Medical-Vocational Rule 201.14 directs a finding of "disabled" based on an inability to perform light work. *Id.* at 11.

The Commissioner argues substantial evidence supports an RFC for light work. [ECF No. 18 at 12]. She maintains the ALJ rejected Plaintiff's

allegations of greater exertional limitations based on the normal consultative exam findings, good response to Ajovy for headaches, mild findings on x-rays of the knee, minimal treatment for knee impairment, minimal treatment for back symptoms, normal EMG, intact coordination, normal motor strength, otherwise normal sensation, physical therapy discharge notes, normal findings during a July 2019 exam, and the state agency consultants' opinions. *Id.* at 12–13. She claims there were conflicts in Plaintiff's statements as to her ADLs. *Id.* at 13–14.

Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)). If the evidence supports a finding that the claimant's medically-determinable impairments could reasonably be expected to cause her alleged symptoms at the first step, she is "entitled to rely exclusively on subjective evidence to prove" her symptoms are "so continuous and/or so severe that [they] prevent [her] from working a full eight hour day" at the second step. *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006).

The ALJ must consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." 20 C.F.R. §

404.1529(c)(4). Other evidence relevant to the evaluation includes "statements from the individual, medical sources, and any other sources that might have information about the claimant's symptoms, including agency personnel, as well as the factors set forth in [the] regulations," which include: (1) the claimant's ADLs; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating or aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures the claimant uses or has used to relieve pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2017 WL 5180304, at *6. The ALJ must explain which of the claimant's symptoms he found "consistent or inconsistent with the evidence in [the] record and how [his] evaluation of the individual's symptoms led to [his] conclusions." SSR 16-3p, 2017 WL 5180304, at *8.

The ALJ found Plaintiff's medically-determinable impairments could reasonably be expected to cause the symptoms she alleged, but concluded her statements concerning the intensity, persistence, and limiting effect of her

symptoms were not entirely consistent with the medical and other evidence.

Tr. at 41. He explained:

> The claimant is able to do a range of light work, as set forth by the claimant's residual functional capacity (RFC). This is consistent with the limitations indicated by the other evidence in this case. While the medical evidence of record reveals that the claimant has DDD of the lumbar spine, obesity, and headaches, the evidence does not support the severity of symptoms, as alleged.

*Id.*

The ALJ recounted findings on MRI of the brain in 2018 and 2020, x-rays of the lumbar spine in January 2019, and EMG in January 2019. Tr. at 41–42. He further wrote:

> Moreover, objective exams, as discussed above, revealed the claimant was obese, she was in no acute distress, her stocking sensation was noted as absent in her neurology notes but otherwise noted as normal and symmetrical, she had normal range of motion in her neck, back and upper and lower extremities, she was negative for straight leg raising, she had normal fine and gross manipulation with full grip strength, she had full strength in her upper and lower extremities with normal muscle bulk and tone and no atrophy, she had intact cranial nerves, her coordination was intact, she could squat with some knee pain, and she could perform gait maneuvers.

Tr. at 42. He acknowledged Plaintiff's ataxic gait and reported use of a walker, but cited her normal gait during Dr. Tomarchio's exam and a lack of atrophy. *Id.* He indicated: "These objective and diagnostic test findings are not consistent with the alleged incapacitating impairments and indicate the claimant's impairments may not be as severe or debilitating as alleged.

Rather, they are consistent with the claimant's ability to perform light work with frequent kneeling." *Id.*

The ALJ further pointed to Plaintiff's conservative treatment that included no surgical intervention, inpatient care, or frequent emergency treatment. *Id.* He stated Plaintiff reported minimal symptoms and sought minimal treatment for back pain. *Id.* He indicated Plaintiff's headaches had recently developed and she had obtained good control after "some medication trial and error." *Id.* He noted Plaintiff's psychiatric symptoms were improved with therapy and medications. *Id.*

The ALJ explained Plaintiff's ADLs were "consistent with her ability to perform detailed, but uninvolved light work." *Id.* He pointed to Plaintiff's abilities to "care for herself independently," "prepare simple meals for herself," "drive short distances," "go shopping in stores," "perform light household chores, such as sweeping, mopping, and vacuuming," "care for her pets," "use a computer and play games on her phone," watch television, "handle finances," and attend doctors' appointments. Tr. at 42–43. He wrote:

> Although the claimant does appear to have some limitations, her assertions are not consistent with the medical evidence of record. The claimant is able to do a range of light work, as noted in the residual functional capacity. The claimant's access to medical treatment has been considered pursuant to SSR 18-3p. The effects of the claimant's pain, fatigue and medications have been considered in assessing the claimant's residual functional capacity and are accommodated within the limitations of same. Thus, the claimant's allegations of limitations are not supported to the extent they conflict with the residual functional capacity.

Tr. at 43.

As noted above, the ALJ's discussion of the objective evidence fails to account for relevant findings contrary to his conclusion that Plaintiff could perform the reduced range of light work he included in the RFC assessment. The ALJ did not rely on the objective evidence alone in concluding Plaintiff's allegations were inconsistent. He also considered the medication and other measures Plaintiff used to address her symptoms, the effectiveness of such treatment, and Plaintiff's ADLs. However, his recitation of Plaintiff's ADLs misrepresents her reports and he fails to connect those ADLs to his conclusion as to her RFC.

"An ALJ may not consider the type of activities a claimant can perform without also considering the extent to which she can perform them." *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). In *Arakas v. Commissioner, Social Security Administration*, 983 F.3d 83, 99 (4th Cir. 2020), the court found the ALJ erred twice in assessing the claimant's ADLs, writing: "First, he improperly disregarded her qualifying statements regarding the limited extent to which she could perform daily activities.[7] Second, the ALJ failed to

_____

[7] The court noted it was inappropriate for the ALJ to cite the claimant's testimony that she could use a computer, do yard work, and paint, while ignoring her testimony that she had difficulty mopping, vacuuming, cooking, cutting, standing, performing most housework, drying her hair, buttoning her blouse, picking up coins or a paper clip from a table, writing her name,

adequately explain how her limited ability to carry out daily activities supported his conclusion that she could sustain an eight-hour workday. A "claimant's inability to sustain full-time work due to pain and other symptoms is often consistent with her ability to carry out daily activities." *Id.* at 101. Indeed, "[t]he critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, and can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer." *Id.* (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)).

Here, the ALJ committed similar errors to the ALJ in *Arakas*. He disregarded Plaintiff's descriptions of her significant limitations in performing those ADLs she could perform and ignored her progressive decline in abilities over the relevant period. Although the ALJ cited Plaintiff's abilities to prepare simple meals, shop, drive short distances, and care for her pet, the record reflects limited ability to perform those activities. Plaintiff informed Dr. Whitley she could "only help to care for the home by washing clothes and feeding pets." Tr. at 616. She explained she could shop with her husband or daughter by using a list and visiting the store when it was not crowded. Tr. at 617. She indicated in a function report that she shopped for

---

walking for exercise, sleeping, and sitting through a church service. *See Arakas*, 983 F.3d at 100.

one hour every two weeks. Tr. at 237. She consistently denied being able to prepare meals in multiple reports. Tr. at 67, 236, 261, 568, 685. She claimed she drove on rare occasions. Tr. at 262, 685, 713. At the hearing, she testified she was no longer able to perform most of the limited activities she previously reported. *See generally* Tr. at 68–77.

The ALJ further failed to explain how Plaintiff's ability to perform the ADLs he referenced equated to an ability to perform light work over an eight-hour workday. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Jobs may be classified as light where they require standing and walking for most of the day or sitting with pushing of arm or leg controls, even if they require lifting very little weight. *Id.* Even if Plaintiff were able to perform all of the activities the ALJ referenced without the qualifying limitations she provided, most of the activities require no physical exertion. The only reference to Plaintiff sweeping, mopping, and vacuuming appears in Dr. Tomarchio's record, and nothing suggests she performed these activities on a level consistent with standing and walking for most of the day and lifting and carrying up to 20 pounds occasionally and up to 10 pounds frequently.

In the absence of an explanation, substantial evidence does not support the ALJ's conclusion that Plaintiff's ADLs were consistent with an RFC for

light work. However, the undersigned declines to address whether the Medical-Vocational Guidelines[8] direct a finding that Plaintiff is disabled, as it is not the role of the court to assess the claimant's RFC.

### 3.    Additional Allegation of Error

Given findings of error for the reasons detailed above, the undersigned declines to address Plaintiff's argument that the ALJ erred in evaluating the severity of her migraine headaches and accounting for them in the RFC assessment.

## III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

March 15, 2022                               Shiva V. Hodges
Columbia, South Carolina            United States Magistrate Judge

---

[8] If Plaintiff had a maximum sustained work capability limited to sedentary work as a result of her impairments, Medical-Vocational Rule 201.06 would direct a finding of "disabled," given her age, education, and lack of transferable skills from her prior semiskilled work. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 2 § 201.06.